**FLORIDA POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent**

Seminole Electric Cooperative, Inc., et al., Intervenors.

No. 95–1199.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1996.

Decided June 11, 1996.

Steven J. Ross, Washington, D.C., argued the cause, for petitioner. With him on the brief was Jacob A. Bouknight, Jr.

Janet K. Jones, Attorney, Washington, D.C., Federal Energy Regulatory Commission, argued the cause, for respondent. With her on the brief was Jerome M. Feit, Solicitor.

Alan J. Roth, Washington, D.C., argued the cause, for intervenor Florida Cities. With him on the brief was Robert A. Jablon.

Robert L. Daileader, Jr., Washington, D.C., entered an appearance for intervenor Tampa Electric Company. William T. Miller entered an appearance, for intervenor Seminole Electric Cooperative, Inc.

Robert D. Vandiver, Jackson, TN, and Diana W. Caldwell, Tallahassee, FL, were on the brief, for intervenor Florida Public Service Commission.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Federal Energy Regulatory Commission rejected a provision of a tariff filed by Florida Power & Light ("FPL"), proffered by FPL as a means of preventing an inefficient interaction between its sales to certain wholesale ("partial requirements") customers and those customers' activities on an automated "economy energy" market, the Florida Coordinating Group Broker. The Commission acknowledged that FPL's proposal would properly thwart some inefficient transactions, but rejected it as "overly broad," because there were other, efficient transactions that it said the proposal would also frustrate. *Florida Power & Light Co.*, 66 FERC ¶ 61,227 at 61,529 (1994) (*"Order on Policy Issues"*), reh. denied, 70 FERC ¶ 61,-158 (1995) (*"Order on Rehearing"*). FPL countered that where the tariff provision thwarted an "efficient" sale by one of FPL's partial requirements customers, FPL itself would be in a position to make the same sale. The Commission never responded to this argument, which on its face appears correct. Further, the Commission's apparent effort to justify the casual quality of its analysis by pointing FPL in the direction of marginal cost pricing for its partial requirements customers is unconvincing; it is most unclear whether that proposed alternative is available in the real world of FERC regulation. Because the Commission's decision failed basic requirements of reasoned decisionmaking,

we reverse and remand the case to the Commission.

\* \* \*

FPL sells power both retail and wholesale. Among its wholesale transactions is "partial requirements" service, under which municipal utilities and rural electric cooperatives augment their self-produced power supplies with FPL's as necessary to meet *their* customers' demands. FPL's rates for these wholesale buyers are based on average costs—a demand charge based on the average cost of generation and transmission resources, and a per-unit energy charge based primarily on FPL's average fuel costs. FPL asserts, and the Commission acknowledges, *Order on Rehearing*, 70 FERC at 61,486, that this average cost pricing is in accord with the Commission's traditional rate design.

Another type of wholesale transaction takes place through the Florida Broker, which enables utilities in Florida to make bulk sales of "economy energy" to each other. On an electronic bulletin board the utilities make hourly postings of amounts of electricity they are interested in selling or buying, along with the incremental costs of producing what they are offering for sale, or the "decremental" costs that they would avert by a purchase. (These costs are evidently the variable costs of production, largely fuel, sometimes with a contribution to fixed capital costs.) The Broker automatically matches up the offers, linking the lowest incremental costs with the highest decremental ones, so that the first match made will be the one that averts the most net costs. The transaction price is midway between the proposals of each member of a matched pair, so that the value of the gain is split evenly between them. The Broker evidently keeps on matching until all economizing possibilities have been exhausted. Some of the net savings by utilities are flowed back to their customers. See *Order on Rehearing*, 70 FERC at 61,485; see also *Order on Policy Issues*, 66 FERC at 61,527 n. 22 (describing Florida Broker operations).

FPL and the Commission appear to agree that, unredressed, the interaction of its partial requirements tariff with the participation of FPL's partial requirements purchasers in the Florida Broker market will lead to some inefficient sales. In an example used by both parties, FPL might at a given hour be able to produce energy at 12 mills per kWh (its incremental cost) but be selling it to its partial requirements customer at 6 mills (its average cost). The latter would offer it to the Broker at 6 mills. Where another utility faced a decremental price of 10, the Broker would dutifully match them up. The transaction goes forward, causing a 12–mill cost to be incurred for a need that could have been satisfied for 10 mills.

FPL proposed solving the problem with a provision in its proposed comprehensive wholesale power sales tariff, limiting bulletin board sales by partial requirements purchasers:

> The Customer may resell capacity and energy purchased under this Rate Schedule; provided, however, that ... the Customer shall not resell energy purchased under this Rate Schedule to other entities pursuant to an economy ... sale [i.e., an "economy energy" transaction] ... without FPL's consent. FPL will consent to such sale for any hour during which FPL's incremental cost for such resold power is expected to be equal to or less than the incremental revenue received under this Rate Schedule in connection with FPL's sale of such power to the Customer.

In rejecting the provision, FERC said that it was overly broad, prohibiting some hypothetically efficient trades on the economy energy market in addition to the inefficient trades of the sort hypothesized above. For example, it explained, where a partial requirements customer was buying at 6 mills, FPL's incremental cost was 8 mills, and the Florida Broker had a proposal to buy at 10 mills, FPL's rule would prevent the sale. *Order on Policy Issues*, 66 FERC at 61,528. The rule would, said FERC, bar a deal that could have saved 2 mills in energy expense.

Of course, one answer to the Commission's hypothetical seems laughably simple, and FPL made it: There appears no obstacle, in such a case, to *FPL's* making the sale. See *Order on Rehearing*, 70 FERC at 61,485

(referring to FPL's argument on rehearing). (We address below whether that solution may have some deleterious side effects.) After all, the partial requirements customer would be taking the power solely for purposes of engaging in the "economy energy" transaction. Further, FPL went on to say, allowing the partial requirements customer to make the sale may actually thwart an alternative and more efficient transaction: if the partial requirements customer offers 8–mill energy at 6 mills, and there is 7–mill energy available, the partial requirements customer's offer will preempt the 7–mill offer—which would have cost less than FPL's 8–mill supply. See *id.*

On rehearing, the Commission recited FPL's argument and then brushed it aside. While reiterating the claim that FPL's solution was "overly broad," *id.* at 61,486, it did not deny that FPL would be able to trade its own power perfectly well, thus making possible the efficient transactions that the Commission had said FPL's rule would stymie. Rather it switched to a new theme—that this would hamper FPL's partial requirements customers' ability to sell their own resources via the Florida Broker. It offered no reason to think that would be so. Assuming that the partial requirements customers can distinguish between their own and FPL's resources, it would seem that they could simply refrain from sales in the Florida Broker market when (1) their own resources were not sufficient for the sale,[1] and (2) FPL's incremental energy cost was higher than its tariffed average cost.

FERC also observed that "[t]he Commission consistently has rejected resale restrictions as an unnecessarily blunt device, given their potential anticompetitive effects and the availability of other ways to address legitimate utility concerns." *Id.* This was the entirety of the Commission's discussion of anticompetitive concerns. Despite the word "consistent" and occasional references to a "per se" rule in other decisions, FERC has not established rejection of resale restrictions as a universal absolute. In *Gulf States*

*Utility Company,* 5 FERC ¶ 61,066 (1978), for example, the Commission carefully distinguished the resale restriction in question from ones with potential *pro* competitive effects, citing *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). See 5 FERC at 61,100 n. 5. Further, the Commission recognized in *Gulf States* that in some cases restrictions with some anticompetitive effect might on balance be desirable as the least-bad solution to a problem. Accordingly, the Commission proceeded to consider "whether the restrictions serve some significant regulatory purpose which cannot be achieved by a less anticompetitive method and which would render them in the public interest notwithstanding that desirable competition is impaired." *Id.* at 61,098. It rejected the resale restriction only after finding that other alternatives, such as requiring timely notice by the utility's customers of changes in their requirements, were available as remedies.

Later Commission decisions have expressed varied readings of *Gulf States.* Compare, e.g., *Ohio Edison Company,* 43 FERC ¶ 61,316 at 61,883 (1988) ("The Commission has ruled that such restrictions are per se unlawful and we direct Ohio Edison to not include such language in any rate schedule it refiles."); *Missouri Public Service Company,* 54 FERC ¶ 61,357 at 62,177 (1991) ("The Commission has consistently applied the per se rule against resale restrictions in subsequent cases [to *Gulf States* ]."), *with Northern Indiana Public Service Company,* 23 FERC ¶ 61,249 at 61,538 (1983) ("We are concerned that this [resale restriction] provision may unduly restrict competition between [the utility] and its wholesale customers. However, we are not prepared to conclude at this time that the provision is per se unlawful."); *Georgia Power Company,* 63 FERC ¶ 61,269 at 62,732 (1993) ("[R]esale restrictions of this type are per se unlawful under established Commission precedent. Georgia was therefore directed to eliminate the restriction *or to justify it in light of the Commission's frequently-stated belief that such*

---

1. This would require some principle of priority. FPL seems implicitly to argue for the principle that the partial requirements customers should

be deemed to be using their own resources first. If there is some objection to this—and there may be—the Commission has yet to state it.

*restrictions are unlawful."*) (emphasis added).

■ Here the Commission's orders have neither invoked a per se rule (with an explicit abandonment of seemingly contrary cases) nor purported to identify any specific anticompetitive harm caused by the tariff provision. Its claim that "efficient sales are thwarted" has already been shown to be attenuated by the fact that FPL can make such transactions itself, and it has made no attempt to show that anticompetitive effects will naturally flow from shifting the profits of such sales from a partial requirements customer to FPL. Moreover, anticompetitive effects are not self-evidently probable when a restriction applies only to resales in an electronic market in which FPL cannot (so far as appears) identify or choose its customers.

Nor has the Commission adequately identified reasonable alternatives justifying rejection of FPL's proposed resale restriction. One might imagine a more narrowly drawn resale restriction provision, perhaps permitting all sales of FPL power by the partial requirements customer so long as FPL's incremental cost, rather than the average cost, is quoted on the Broker. But the Commission relies on only one alternative: a change in FPL's rate structure for its partial requirements customers.

All hands recognize that the problem originates in the use of average costs for FPL's sales to its partial requirements customers. Accordingly, both in the *Order on Policy Issues,* 66 FERC at 61,529 & n. 29, and more emphatically in the *Order on Rehearing,* 70 FERC at 61,486–61,487, the Commission alluded to the possibility that FPL might file completely new tariffs based on marginal cost pricing. If partial requirements customers paid for energy the same way that buyers in the economy energy market did, there would be no arbitrage to exploit in a resale, and no inefficient trades would result. See *Order on Policy Issues,* 66 FERC at 61,528–61,529. Of course, marginal cost pricing in some markets presents its own problems, see, e.g., Ronald Coase, "The Marginal Cost Controversy," 13 *Economica* n.s. 169 (1946), *reprinted in* Ronald Coase, *The Firm, the Market, and the Law* 75 (1988), but those

refinements are not at issue here. FPL in its rehearing petition bristled at the Commission's suggestion of a marginal cost rate design as a plausible alternative solution, pointing to the Commission's traditional insistence on average costs. The Commission responded only with some remarks vaguely favorable to marginal cost pricing, but clearly not amounting to a commitment to embrace the principle for wholesale power pricing, *Order on Rehearing,* 70 FERC at 61,486–61,487, and proceeded to deny the petition.

The Commission's answers to FPL, within the existing regulatory framework, did not satisfy FERC's duty to engage in "reasoned decisionmaking." See *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970). It never responded, for example, to FPL's point that the utility itself could make the efficient sales the Commission seems to have assumed would be thwarted by the tariff provision. There may be an answer—lurking perhaps in the relations between FPL and its partial requirements customers, or in distributional concerns as between those parties—but FERC has not yet revealed it.

That deficiency leaves the Commission relying on its allusions to the possibility of marginal cost pricing for FPL's sales to its partial requirements customers. But FPL says, and FERC does not dispute, that in the course of decades of electric power regulation there is only one instance in which FERC has actually approved wholesale power rates based on marginal costs. See *New England Elec. Power Co.,* 52 FERC ¶ 61,090 (1990), *reh'g denied,* 54 FERC ¶ 61,055 (1991), *aff'd, Town of Norwood v. FERC,* 962 F.2d 20 (D.C.Cir.1992). We do not believe FERC's mere mention of the possibility of marginal cost pricing justifies its refusal to approve a tariff provision that appears to enhance efficiency (in the name of which FERC purported to act) in the here-and-now regulatory world of FERC's own design.

FERC counters that "significant changes are on the way for the electric industry," and points to its intentions to "structure an orderly transition to more competitive markets." Brief for Respondent at 21. Indeed, recent FERC initiatives may render the

whole issue moot by establishing conditions for widespread competition between power generators and thus for reliance on markets rather than regulators to constrain wholesale power prices. See Order No. 888, *Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed.Reg. 21540 (1996). While we are quite sympathetic to FERC's implicit claim that we should cut it some slack in this era of wide-ranging reform, allowing it to devote its intellectual resources primarily to the broader picture, we find that the Commission's explanation here fails to meet the basic reasoned decisionmaking requirement.

■ The Commission's counsel raises various arguments not mentioned within or even implied by the orders on review. But the agency runs this regulatory program, not its lawyers; parties are entitled to the agency's analysis of its proposal, not post hoc salvage operations of counsel. We therefore do not consider these arguments. See *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95, 63 S.Ct. 454, 461–63, 87 L.Ed. 626 (1943); *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1316 (D.C.Cir.1991).

If the Commission means to adopt and follow a per se rule against resale restrictions, it must be clear as to the scope of the rule and its justification. If the rule is not per se, the Commission must point out the anticompetitive effects of FPL's proposal, and, to the extent that availability of alternative solutions to FPL's evidently legitimate concern remains an element of the Commission's analysis, just what that alternative may be.

The petition for review is granted and the case remanded to the Commission.

*So ordered.*