# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-3936

CELIA MORALES-MORALES,

*Petitioner,*

*v.*

JOHN ASHCROFT, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A77-459-612

ARGUED SEPTEMBER 16, 2003—DECIDED SEPTEMBER 15, 2004

Before FLAUM, *Chief Judge,* and DIANE P. WOOD and
WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Celia Morales-Morales
(Morales) is a Mexican citizen who has resided in the
United States since her original entry without inspection in
1986. After briefly returning to Mexico to attend to her
gravely ill mother, Morales repeatedly and unsuccessfully
attempted to reenter the United States in March 1999.
Ultimately, she was arrested and convicted for the latter
attempt. Upon Morales's release from imprisonment, the

Immigration and Naturalization Service (INS)[1] initiated removal proceedings, and Morales in turn applied for cancellation of removal. The Immigration Judge (IJ) ruled that Morales's brief absence from the country rendered her ineligible under the statute for cancellation of removal, and on that ground only, rejected her petition. The Board of Immigration Appeals (BIA) affirmed without opinion under its streamlining procedure. Because we conclude that the statute did not preclude this relief for Morales, we grant her petition for review and remand for further proceedings.

# I

Morales first entered the United States without inspection (*i.e.*, illegally) in June 1986 at age 16. She is married to a lawful permanent resident of the United States and is the mother of four U.S. citizen children, ranging in age from nine to 16 years old. As far as this record shows, Morales remained in the United States from the time of her entry until early March 1999, when she returned to Mexico to visit her ailing mother. On March 22, 1999, after about two weeks in Mexico, Morales reentered the United States without inspection. The U.S. Border Patrol promptly detained her informally, and she voluntarily returned to Mexico. These events repeated themselves on three more occasions over the course of six days. Morales testified that each time the Border Patrol "just took me, threw me around, and turned me back." Importantly, she never appeared before an immigration judge, and no removal proceedings were initiated. On March 31, 1999, the U.S. Border Patrol apprehended Morales as she entered the country without inspection for the fifth time. This time the authorities took

---

[1] The INS no longer exists as an independent agency within the Department of Justice and is now part of the Department of Homeland Security.

matters more seriously. Morales was charged with, and pleaded guilty to, illegal entry in violation of 8 U.S.C. § 1325 and 8 U.S.C. § 1329, and was sentenced to 179 days' imprisonment, which she served.

Upon completion of her sentence, Morales was released into the custody of the INS, which initiated removal proceedings. Shortly thereafter, Morales applied for cancellation of removal under 8 U.S.C. § 1229b(b). On January 11, 2001, an IJ found that Morales's "return to Mexico by the Immigration Service was meaningfully interruptive of her physical presence," and therefore she could not satisfy the ten years of continuous physical presence required for eligibility for cancellation of removal. See 8 U.S.C. § 1229b(b)(1)(A). On this basis, the IJ denied Morales's application for cancellation of removal and ordered that she be deported to Mexico. Morales appealed to the BIA, which affirmed without opinion under its streamlining procedure on October 7, 2002. See 8 C.F.R. § 1003.1(a)(7). This petition for review followed.

## II

Before we reach the merits of Morales's appeal, we must address several preliminary matters. The first concerns this court's jurisdiction over her petition for review. We have an independent obligation to ensure that subject matter jurisdiction is proper before proceeding to the merits, even where, as here, neither of the parties has raised this as an issue in the case. *Smith v. Am. Gen. Life & Acc. Ins. Co.*, 337 F.3d 888, 892 (7th Cir. 2003). The governing statute is 8 U.S.C. § 1252(a)(2)(B), which reads as follows:

(B) Denials of discretionary relief

Notwithstanding any other provision of law, no court shall have jurisdiction to review—

(i) any judgment regarding the granting of relief

> under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under section 1158(a) of this title.

Section 1229b, which is included in the list in part (i), governs cancellation of removal. The question before us is whether this statute was intended to preclude all judicial review whatsoever, or only judicial review of the way in which the Attorney General exercises his discretion. At first blush, the language of the statute appears to be quite broad: read literally, it would preclude judicial review even of a decision by the Attorney General to deny cancellation of removal to all Muslims, or a decision by the Attorney General to eliminate this form of relief from the statute altogether. In other areas of immigration law, however, courts have resisted such an extreme position. Instead, relying on the proposition that at a minimum, jurisdiction to determine jurisdiction exists, see *Jideonwo v. INS*, 224 F.3d 692, 696 (7th Cir. 2000), courts have exercised the authority to decide whether the particular alien's claim falls within the scope of the jurisdiction-stripping statute. See, *e.g.*, *Yang v. INS*, 109 F.3d 1185, 1192 (7th Cir. 1997) (deciding whether the alien had committed one of the enumerated crimes that leads to automatic, and unreviewable, removal from the United States).

Although it is true that Morales ultimately wants cancellation of removal, that is not the relief she is seeking before this court—for good reason, as we have no power to grant that relief. Instead, she seeks to have the Attorney General consider her petition for cancellation of removal under the correct interpretation of the eligibility requirements set forth in § 1229b(b). That is not the same as

requesting review of the grant or denial of cancellation of removal, any more than the request by certain Caucasian applicants to the University of Michigan for a race-neutral admissions process necessarily included a demand for a spot in the class. See *Gratz v. Bollinger*, 539 U.S. 244, 252 (2003) (relief requested included damages, an injunction requiring reformation of the admissions process, and only lastly an order requiring an opportunity to transfer to the University). Morales's petition only indirectly concerns the ultimate grant or denial of cancellation of removal; its focus is on the meaning of the statutory criteria that cabin the Attorney General's decisionmaking. In that respect, it is much like *Yang*, where the only issue was whether the petitioner had committed the kind of crime that led to removal.

Although our conclusion that § 1252(a)(2)(B) does not foreclose review of this narrow set of questions is consistent with the fact that the statute expressly refers to denials of "discretionary" review in the caption, we recognize that the caption alone is of limited help in understanding the actual text of the law. Compare *INS v. St. Cyr*, 533 U.S. 289, 308-09 (2001) (holding that a section captioned "elimination of review by habeas corpus" did not eliminate all such review). We come to this result instead because the statute does not clearly indicate that the exclusion from judicial review is so extreme as to purport to authorize the Attorney General to disregard both the Constitution and the statutory criteria set forth by Congress. As we suggested in *Fornalik v. Perryman*, 223 F.3d 523 (7th Cir. 2000), a case may "fall outside [§ 1252(a)(2)(B)'s] scope because [the petitioner] is challenging a pure error of law . . . , not the exercise of discretion." *Id.* at 532; *cf. Romero-Torres v. Ashcroft*, 327 F.3d 887, 890 (9th Cir. 2003) ("We retain jurisdiction [under § 1252(a)(2)(B)] to review the purely legal and hence non-discretionary question whether [the applicant's] adult daughter qualifies as a 'child' for purposes of the 'exceptional and extremely unusual hardship' requirement." (Citations omitted)).

We have taken the same approach to the very next subsection of the statute, 8 U.S.C. § 1252(a)(2)(C), which provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in" certain enumerated sections. In applying § 1252(a)(2)(C), we have held that "all persons ordered removed retain the right to judicial review of the antecedent, non-discretionary questions, such as whether they are aliens and whether they have committed disqualifying crimes." *Gill v. Ashcroft*, 335 F.3d 574, 575 (7th Cir. 2003); see also *Bosede v. Ashcroft*, 309 F.3d 441, 445 (7th Cir. 2002) ("We have held before on a number of occasions that the review-preclusion provisions in the 1996 amendments to the immigration laws do not prevent us from determining whether the alien is being removed for a permissible reason.").

Our conclusion is also consistent with the decisions of the other circuits that have already confronted the question before us, namely, whether the determination that an alien has established continuous physical presence for purposes of § 1229b(b)(1)(A) is subject to judicial review. In *Kalaw v. INS*, 133 F.3d 1147 (9th Cir. 1997), the Ninth Circuit considered whether § 1252(a)(2)(B) barred judicial review of a BIA determination that an alien had not satisfied the "continuous physical presence" requirement for suspension of deportation, the equivalent of cancellation of removal under prior law. *Id.* at 1151. The court concluded that continuous physical presence "must be determined from the facts, not through an exercise of discretion." *Id.* It further stated that "[t]here are legal standards guiding this inquiry, and we have reversed the BIA's determination when it applied the wrong standard." *Id.* (internal citations omitted). It concluded that § 1252(a)(2)(B) "do[es] not remove appellate jurisdiction over an alien's challenge to the BIA's denial of an application for suspension of deportation solely on th[e] ground" of continuous physical presence. *Id.*; see

also *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 853 (9th Cir. 2003). Citing *Kalaw*, the Fifth Circuit recently held that "whether an alien satisfies the continuous physical presence requirement is a nondiscretionary determination because it involves straightforward statutory interpretation and application of law to fact." *Mireles-Valdez v. Ashcroft*, 349 F.3d 213, 217 (5th Cir. 2003). That court too concluded that it had "jurisdiction to review whether [the petitioner] was ineligible for cancellation because he lacked the required continuous presence." *Id.*

We find this analysis persuasive and join our sister circuits in holding that the meaning of the term "continuous physical presence" is a non-discretionary question of statutory interpretation. As such, it falls outside § 1252(a)(2)(B)'s jurisdiction-stripping rule. We thus are free to proceed to decide the antecedent, non-discretionary question whether the IJ correctly interpreted the rules determining when a break in physical presence has occurred.

### III

Before answering this question, we offer a brief comment on the procedural posture of this case. As noted above, the BIA gave this case only streamlined review. The BIA's streamlining procedure set out in 8 C.F.R. § 1003.1(a)(7) provides that a single member of the BIA may affirm, without opinion, the results of an IJ's decision if the member determines (1) that the result reached in the decision under review was correct; (2) that any errors in the decision under review were harmless or non-material; and (3) that (A) the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation; or (B) the factual and legal questions raised on appeal are so insubstantial that three-member review is not warranted. "If a case is streamlined, the IJ's decision becomes that of the BIA for purposes

of judicial review." *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). Thus, while "[t]his court reviews only the final determinations of the BIA," in practical effect this means the IJ's decision in a case like this one.

Streamlining has its institutional costs, however, and it seems that they were incurred in this case. Unfortunately, the procedural short cut the Board took may have caused it to overlook the IJ's reliance on a defunct legal principle and one of its own intervening decisions. We do not know that, of course, because the thinking of the responsible BIA member is entirely opaque. We turn perforce to the IJ's opinion, which offers the rationale for the decision that the agency must now defend.

## IV

### A

The statute governing cancellation of removal is 8 U.S.C. § 1229b. It is important to recall that this statute permits the Attorney General to cancel removal not only for aliens who were lawfully admitted for permanent residence, see § 1229b(a)(1), but also for aliens who are "inadmissible or deportable from the United States," see § 1229b(b)(1), if the alien:

> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;
>
> (B) has been a person of good moral character during such period;
>
> (C) has not been convicted of [certain enumerated offenses]; and
>
> (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or

an alien lawfully admitted for permanent residence.

The statute goes on to specify "special rules relating to continuous residence of physical presence" in § 1229b(d); it is the rules specifying the proper treatment of "certain breaks in presence," 8 U.S.C. § 1229b(d)(2), that lie at the heart of Morales's case:

> (2) Treatment of certain breaks in presence
>
> An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) of this section if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

Morales's petition for cancellation of removal required the IJ to determine whether, for purposes of 8 U.S.C. § 1229b(d)(2), she had "failed to maintain continuous physical presence in the United States" because she had departed from the United States for any single period in excess of 90 days or for several periods that in the aggregate exceeded 180 days. If, as the IJ thought, Morales's illegal reentries had the effect of starting the clock anew, then she is not eligible for cancellation of removal. If, on the other hand, those reentries did not have this effect as a matter of law, then the IJ's decision was based on an erroneous foundation. The number of days Morales was gone was undisputed: she was out of the country for less than 30 days. The IJ nonetheless decided that she was ineligible under the statute because, in his view, departures for periods shorter than those specified in § 1229b(d)(2) could also qualify as breaks in physical presence for purposes of § 1229b(b)(1)(A).

In reaching this result, the IJ relied on the superseded "*Fleuti* doctrine," under which an alien's "innocent, casual, and brief" departure from this country was not a break in physical presence, see *Tapia v. Ashcroft*, 351 F.3d 795, 799 (7th Cir. 2003), whereas when an alien left the United

States "for a reason that is inconsistent with the policies reflected in this country's immigration laws, the 'interruption of residence thereby occurring would properly be regarded as meaningful.'" *Selimi v. INS*, 312 F.3d 854, 859 (7th Cir. 2002) (quoting *Rosenberg v. Fleuti*, 374 U.S. 449, 462 (1963)). The IJ reasoned that "[i]n light of the ambiguity in the heading" of 8 U.S.C. § 1229b(d)(2)—whose heading is worded "Treatment of *certain* breaks in presence" (emphasis added), rather than "Treatment of *all* breaks in presence"—"the *Fleuti* doctrine and the concept of meaningfully interruptive departures still exist under the current law." As Morales's "return to the United States could not be considered casual, and certainly not meaningless," the IJ concluded that she could not establish continuous physical presence and thus was ineligible for cancellation of removal.

The IJ's analysis fails to take into account the fact that the *Fleuti* doctrine was superceded by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) (IIRIRA). See *Tapia*, 351 F.3d at 799; *In re Collado*, 21 I. & N. Dec. 1061, 1065 (BIA 1998) ("Thus, we find that the *Fleuti* doctrine . . . does not survive the enactment of the IIRIRA as a judicial doctrine."). Under the IIRIRA, "[t]he physical presence requirement[ ] . . . *does not* include the 'innocent, casual, and brief' standard, and instead opts for a quantitative standard—any absence outside the country for more than 90 days at a time, or 180 days in total, breaks the physical presence requirement." *Tapia*, 351 F.3d at 799 (emphasis added); *Collado*, 21 I. & N. Dec. at 1064 n.4 (noting that the "previous use of the 'brief, casual, and innocent' concept . . . was not carried forward by Congress in the IIRIRA's new cancellation of removal provisions."). Before this court, the government has acknowledged that the IJ erred in relying on the *Fleuti* doctrine. It is also clear from the facts that Morales was nowhere near either the 90-day or the 180-day period established by the statute. We see no warrant for the

IJ to read this statute as establishing only a maximum number of days, rather than a bright-line administrative rule.

The government has attempted to salvage the IJ's result—though not his reading of the statute—by arguing that this was a harmless error in light of the BIA's subsequent decision in *In re Romalez-Alcaide*, 23 I. & N. Dec. 423 (BIA 2002). *Romalez*, which was decided after the IJ's decision in Morales's case but before the BIA's summary affirmance, holds that "a departure that is compelled under threat of the institution of deportation or removal proceedings is a break in physical presence for purposes of" 8 U.S.C. § 1229b(b). *Id.* at 424.

*Romalez* helps the government, however, only if it applies to Morales's situation. As we explain in more detail below, it does not. Furthermore, this is a theory that is entirely absent from the IJ's opinion, and thus we have no reason to think that the IJ or the BIA would have extended *Romalez* to Morales's distinctly different circumstances. While government counsel may think that there is a good reason to do so, a lawyer's arguments cannot substitute for a reasoned opinion by the IJ or BIA. See *Mengistu v. Ashcroft*, 355 F.3d 1044, 1046 (7th Cir. 2004) (reiterating that the *Chenery* doctrine "forbids the lawyers for an administrative agency to defend the agency's decision on a ground different from that stated or at least discernible in the decision itself"); *Florida Power & Light Co. v. F.E.R.C.*, 85 F.3d 684, 689 (D.C. Cir. 1996) ("[The agency's] counsel raises various arguments not mentioned within or even implied by the orders on review. But the agency runs this regulatory program, not its lawyers; parties are entitled to the agency's analysis of its proposal, not post hoc salvage operations of counsel.").

**B**

We turn then to *Romalez*, in which the BIA held that voluntary departure *under threat of deportation or removal proceedings* constitutes a break in continuous physical presence. The record contains no evidence that any of Morales's voluntary departures occurred under that kind of threat. Instead, she was simply returned to the border.

In *Romalez*, the BIA considered an application for cancellation of removal submitted by a Mexican citizen who unlawfully entered the United States in 1984. *Romalez*, 23 I. & N. Dec. at 423. Romalez departed in 1993 and again in 1994 "under threat of deportation," but each time remained in Mexico for only one or two days before unlawfully returning to the United States. *Id.* After Romalez was charged with removability, he applied for cancellation of removal. *Id.* at 424. The BIA found Romalez ineligible for cancellation of removal because "a departure that is compelled under threat of the institution of deportation or removal proceedings is a break in physical presence for purposes of" § 1229b(b)(1)(A). *Id.* In reaching this result, the BIA concluded that "[t]he statutory language [of § 1229b(d)(2)] does not literally forgive any single departure of 90 days or less or aggregate departures of 180 days or less." *Id.* at 425. In particular, § 1229b(d)(2) does not "forgive a departure following an arrest by the Border Patrol with the threat that formal proceedings will be commenced absent the alien's voluntary return to his or her native country." *Id.* at 426.

The BIA's analysis makes clear that its holding in *Romalez* applies only to aliens who accept voluntary departure under threat of deportation or removal proceedings. As the government recognizes in its brief before this court, "voluntary departure" is "a term of art, denoting a form of relief from removal provided for by statute." See 8 U.S.C. § 1229c. Under § 1229c(a)(1), "[t]he Attorney General may permit an alien voluntarily to depart the United States at the alien's

own expense under this subsection, in lieu of being subject to [removal] proceedings under section 1229a of this title or prior to the completion of such proceedings . . . ." See also 8 C.F.R. § 240.25 (detailing the scope of the government's authority to grant voluntary departure).

In *Romalez*, the BIA explained that voluntary departure operates "like a plea bargain," in that "[t]he alien leaves with the knowledge that he does so in lieu of being placed in proceedings. . . . There is no legitimate expectation by either of the parties that an alien could illegally reenter and resume a period of continuous physical presence." 23 I. & N. Dec. at 429. Because "an order of removal is intended to end an alien's presence in the United States," the BIA "believe[d] it would be contrary to the very reason for departure and removal orders, as well as *enforced voluntary departures*, to read section [1229b(d)(2)] as preserving the period of physical presence acquired prior to an enforced departure for an alien who returns within 90 days of the enforcement action." *Id.* at 426-27 (emphasis added).

The BIA further observed that this result is consistent with the Attorney General's regulations implementing the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, § 203(b), 111 Stat. 2193, 2198 (1997), amended by Pub. L. No. 105-139, 11 Stat. 2644 (1997) (NACARA). These regulations provide that "a period of continuous physical presence is terminated whenever an alien is removed from the United States under an order issued pursuant to any provision of the Act or the alien has voluntarily departed under the threat of deportation . . . ." 8 C.F.R. § 240.64(b)(3). Thus, the BIA explained, "the Attorney General has interpreted the continuous physical presence requirement for NACARA special rule cancellation of re-moval as being broken or 'terminated' by departure under an order of removal, an order of deportation, or the 'threat of deportation.'" *Romalez*, 23 I. & N. Dec. at 428. We therefore conclude that *Romalez* establishes only that a voluntary

departure that occurs under the threat of removal breaks the alien's continuous physical presence in the United States for purposes of establishing eligibility for cancellation of removal.

The three other circuits that have considered *Romalez* have likewise done so only in the context of aliens who voluntarily departed under threat of deportation or removal proceedings. In *Vasquez-Lopez v. Ashcroft*, 343 F.3d 961 (9th Cir. 2003), the Ninth Circuit held that *Romalez* governed its review of the BIA's "determination that [the petitioner's] departure from the United States pursuant to a grant of administrative voluntary departure . . . occasioned a break in his 'continuous physical presence in the United States.'" *Id.* at 969. The court emphasized that an administrative "voluntary departure" occurs "pursuant to an agreement between Petitioner and the Attorney General under which Petitioner agreed to depart and not to return other than in accordance with the entry process applicable to all aliens." *Id.* at 974. The court thus found persuasive the BIA's conclusion in *Romalez* that as "administrative voluntary departures [are] in lieu of removal proceedings . . . , it follow[s] that administrative voluntary departures should likewise be seen as severing the alien's physical tie to the United States." *Id.* at 972.

The Fifth and Eighth Circuits have likewise adopted this approach. In *Mireles-Valdez*, the Fifth Circuit concluded that the BIA's holding in *Romalez*—"that voluntary departure under threat of deportation interrupted continuous presence for cancellation purposes"—was reasonable and, on this basis, denied the petitioner relief. 349 F.3d at 218. The court stressed that "voluntary departure, whether offered at the end of immigration proceedings or earlier at the border (as in this instance), is granted an alien as a form of clemency in return for his agreeing to relinquish his illegal presence." *Id.* Thus, "[w]hen the Attorney General grants voluntary departure, the alien cannot later claim that he

did so while continuing his continuous presence for use in a future adjudication for discretionary relief." *Id.* Most recently, the Eighth Circuit relied on *Romalez*'s holding "that continuous physical presence comes to an end when an alien voluntarily departs under threat of deportation" in denying relief to an alien in such a position. *Palomino v. Ashcroft*, 354 F.3d 942, 944-45 (8th Cir. 2004).

We have no quarrel with *Romalez*'s rule that voluntary departure under threat of deportation or removal proceedings—also referred to by the BIA as "departures made under threat of the institution of deportation proceedings"—constitutes a break in continuous physical presence for purposes of § 1229b(b)(1)(A). See *Romalez*, 23 I. & N. Dec. at 425. The question for us, however, is whether this rule should be extended to voluntary departures that occur without any hint of such a threat. There is absolutely no evidence in the record before us that Morales voluntarily departed for Mexico under threat of removal or deportation proceedings. Morales testified that on each of the four occasions that the U.S. Border Patrol detained her prior to her final arrest, she never appeared before an IJ and was never placed in proceedings. Rather, she testified that each time the Border Patrol "just took me, threw me around, and turned me back." When the IJ inquired whether Morales asked to be returned to Mexico or asked to see a judge, Morales replied, "I did not ask for anything." There is no other evidence in the record regarding the nature of Morales's departures following these detentions.

There is a significant difference between Morales's account of the Border Patrol simply turning her back at the border and voluntary departure under threat of removal proceedings. Under the BIA's own regulations, "voluntary departure shall be communicated in writing" and "may not be granted unless the alien requests voluntary departure and agrees to its terms and conditions." 8 C.F.R. § 240.25(c). Importantly, "[a] voluntary departure order permitting an

alien to depart voluntarily shall inform the alien of the penalties under [8 U.S.C. § 1229c(d)]," which include a civil penalty of not less than $1,000.00 and ineligibility for a period of 10 years for voluntary departure, cancellation of removal, and permanent residence status if the alien fails to depart voluntarily within the specified time period. 8 C.F.R. § 240.25(b). Given these elaborate conditions, it is understandable why the BIA in *Romalez* described voluntary departure as "like a plea bargain," in which "[t]here is no legitimate expectation by either of the parties that an alien could illegally enter and resume a period of continuous physical presence." 23 I. & N. Dec. at 429. The Ninth Circuit likewise characterized voluntary departure as occurring "pursuant to an agreement between Petitioner and the Attorney General." *Vasquez*, 343 F.3d at 974; see also *Palomino*, 354 F.3d at 945; *Mireles*, 349 F.3d at 218.

None of these conditions was satisfied in Morales's case. She did not enter into any functional "plea bargain" or "agreement" that would have signified her "knowledge that [she departed] in lieu of being placed in proceedings," or alerted her to the consequences of her illegal return to the United States after her departure to Mexico. *Romalez*, 23 I. & N. Dec. at 429. Nor can we say with confidence that there was "no legitimate expectation by either of the parties that [Morales] could illegally reenter and resume a period of continuous physical presence." *Id.* We simply cannot equate being turned back at the border with a formal voluntary departure or departure under an order of removal or deportation. While the latter necessarily breaks continuous physical presence, the former does not.

Given the stakes associated with voluntary departure, including both the penalties provided for in § 1229c(d) and the break in continuous physical presence established by *Romalez*, we conclude that this record does not demonstrate that Morales voluntarily departed under threat of proceedings. When an alien is simply returned to the border

without voluntarily departing under threat of deportation or removal proceedings, there is no break in continuous physical presence for purposes of § 1229b(b)(1)(A).

Before concluding, we consider one more possibility, although this was not fully developed by the government and thus would not be a proper ground for denying the petition in any event. Perhaps one might say that Morales was not "in" the United States at all at the time of these proceedings, because she was at last stopped at the border and prosecuted for her final effort at entry. See, *e.g.*, *Zadvydas v. United States*, 533 U.S. 678, 693 (2001). But that argument proves too much for the statute we are considering. No one who needs to invoke § 1229b(b)(1) and (d)(2) has "entered" the United States lawfully, and everyone seeking cancellation of removal is in the midst of removal proceedings. The statutes would be a nullity if the lack of lawful entry made it impossible to establish any period of continuous residence. Moreover, § 1229b(d)(2) contemplates both departures and further unlawful entries, subject to the 90-day and 180-day rules. The fact that Morales was prosecuted for trying to re-enter simply underscores the fact that she was not lawfully admitted. At the very least, in the absence of a fully developed position by the BIA on this point, we see no reason to carve out Morales's situation from the others addressed by the statute. Should the BIA (as opposed to its lawyers) address this in the future, we will of course consider its interpretation under whatever level of deference is appropriate.

We therefore remand to the BIA to determine Morales's eligibility for cancellation of removal. On the record as it stands, it appears that Morales has satisfied the continuous physical presence requirement. If, however, additional evidence regarding this issue is available, both sides are entitled to present such evidence on remand. Finally, as an aside, we note that the IJ in this case stated that "the respondent in this case will most likely be able to meet the

exceptional and extremely unusual hardship factors" for cancellation of removal, but he refrained from deciding the issue in light of his finding that Morales had not established continuous physical presence.

## V

For the reasons stated above, we GRANT Morales's petition for review and REMAND her case to the BIA for proceedings consistent with this opinion.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*