**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE DE JESUS TAPIA,
                            *Petitioner,*

                v.

ALBERTO R. GONZALES,* Attorney
General,

                            *Respondent.*

No. 03-74615

Agency No.
A79-255-521

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 4, 2005—Portland, Oregon

Filed December 6, 2005

Before: Alfred T. Goodwin and Richard R. Clifton,
Circuit Judges, and John S. Rhoades, Sr.,** District Judge.

Opinion by Judge Clifton

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**The Honorable John S. Rhoades, Sr., Senior United States District Judge for the Southern District of California, sitting by designation.

15727

**COUNSEL**

Phillip Smith (argued) and Raquel E. Hecht, Hecht & Smith, LLP, Eugene, Oregon, for the petitioner.

William C. Erb (argued) and Theresa M. Healy, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

---

**OPINION**

CLIFTON, Circuit Judge:

Jose de Jesus Tapia petitions for review of a decision by the Board of Immigration Appeals ("BIA") affirming without opinion the decision by an immigration judge ("IJ") denying his petition for cancellation of removal. To be eligible for cancellation of removal, a form of relief which permits an alien otherwise subject to being expelled from the United States to remain in this country, the alien must prove, among other things, that he or she has been physically present in the United States for a continuous period of at least ten years.[1] A short departure from the United States, such as a brief return to the alien's native country for family reasons, does not necessarily interrupt the accrual of an alien's period of physical presence in the United States, pursuant to an exception for brief absences provided in 8 U.S.C. § 1229b(d)(2). An alien

---

[1]Cancellation of removal is authorized under 8 U.S.C. § 1229b, which provides the Attorney General with the authority to exercise discretion to cancel an alien's order of removal and adjust the alien's status to that of an alien lawfully admitted for permanent residence, provided the alien establishes certain predicate conditions. The first of those conditions, set forth at § 1229b(b)(1)(A), is the one at issue here. Specifically, the statute provides that in order for an alien to be eligible for cancellation of removal, he must have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application."

who has briefly departed the United States for such a reason can still satisfy the ten-year presence prerequisite to qualify for cancellation of removal by including the time spent here before the brief absence.

Some absences do interrupt an alien's continuous physical presence, no matter how brief. In *Vasquez-Lopez v. Ashcroft*, 343 F.3d 961, 972 (9th Cir. 2003), *amending* 315 F.3d 1201 (9th Cir. 2003), we held that an alien who left the United States pursuant to a formal process known as administrative voluntary departure[2] could not continue to accrue presence in the United States from an earlier date. In so holding, we explicitly deferred to *In re Romalez-Alcaide*, 23 I. & N. Dec. 423 (BIA 2002) (en banc), in which the BIA concluded that an administrative voluntary departure interrupted an alien's continuous physical presence.

But what if the alien departed the country on his own to attend to a family matter and was stopped and turned away at the border by immigration officials when he initially attempted to return to this country a month later, as in the case before us? Does such a rejection have the same effect as an administrative voluntary departure, terminating the accrual of physical presence in the United States for the purpose of eligibility for cancellation of removal? The IJ concluded that it does, reasoning that this case was also controlled by *Romalez-Alcaide*. The BIA affirmed without opinion. We disagree, however, and conclude that being turned away at the border by immigration officials does not have the same effect as an administrative voluntary departure and does not itself interrupt the accrual of an alien's continuous physical presence. Because that was the reason Tapia was deemed ineligible for cancellation of removal, we grant his petition for review and remand for further proceedings.

---

[2]Administrative voluntary departure is " 'a term of art, denoting a form of relief from removal provided for by statute.' " *Morales-Morales v. Ashcroft*, 384 F.3d 418, 425-26 (7th Cir. 2004) (quoting a brief filed by the government).

## I.  BACKGROUND

Tapia testified that he has been living in the United States since January of 1991 and has worked for the same employer since his arrival, beginning as a general field hand and progressing to a more senior full-time position at one of the company's strawberry nurseries. He earns approximately $38,000 to $40,000 a year, and his employer provides housing for his family. In February 1997 Tapia married his wife, who at that time was also present here illegally. Ten months later they had a son born in the United States.

Upon learning of his brother's death, Tapia went to Mexico in December of 1999 to be with his parents. Beginning on January 14, 2000, Tapia attempted to cross back into the United States. On his first four attempts, Tapia was stopped, turned around, and sent back to Mexico each time. Each of Tapia's thwarted crossings was documented by immigration officials, who entered his fingerprints and picture in the computer database designed to track individuals apprehended at the border. On his first attempt, he was apprehended at the point of entry in El Paso, Texas, detained for a few hours, and then simply released back to Mexico. The next day Tapia attempted to cross the border approximately sixteen miles away in Fabens, Texas. He was apprehended and returned to Mexico. Three days later he tried again in Fabens, with the same result. He next attempted to cross in Boulevard, California, on January 23, 2000. Once again, he was caught and released back to Mexico. On his fifth attempt, on or about January 30, 2000, Tapia made it across the border, albeit without proper authorization, and thereafter returned to his home and family in Oregon.

On March 15, 2001, the government brought proceedings to remove both Tapia and his wife from the United States. Each applied for cancellation of removal and adjustment of status to that of an alien lawfully admitted for permanent residence under 8 U.S.C. § 1229b(b). Mrs. Tapia prevailed as the

primary caregiver for her seriously ill mother, a permanent resident awaiting a liver transplant.

The IJ ruled against Tapia, however, relying on *Romalez-Alcaide*, as noted above. In that decision, the BIA held that an alien who departed pursuant to a grant of administrative voluntary departure terminated the continuity of his physical presence. 23 I. & N. Dec. at 429. Although the IJ characterized each of Tapia's four failed attempts to reenter the United States as merely "a turnaround at the border," he concluded that such a turnaround was legally equivalent to the administrative voluntary departure at issue in *Romalez-Alcaide*, since in both situations the alien made a choice to depart the country in lieu of removal proceedings. As a result, the IJ held that Tapia did not satisfy the ten-year requirement and was not eligible for cancellation of removal. The IJ denied Tapia's petition and granted him voluntary departure in lieu of removal. The BIA affirmed the IJ's decision without opinion.

## II.   JURISDICTION

While 8 U.S.C. § 1252(a)(2)(B) precludes a court's direct review of the Attorney General's discretionary decisions, the court may consider the predicate legal question of whether the IJ properly applied the law to the facts in determining an individual's eligibility to be considered for relief. *See Romero-Torres v. Ashcroft*, 327 F.3d 887, 889-90 (9th Cir. 2003). The determination of whether an alien has satisfied the continuous physical presence requirement is a factual inquiry guided by legal standards. The decision is non-discretionary, so we retain appellate jurisdiction over the issue. *See Kalaw v. INS*, 133 F.3d 1147, 1151 (9th Cir. 1997).

## III.   DISCUSSION

Where the BIA affirms an IJ's order without opinion, we review the IJ's decision as the final agency action. *Khup v. Ashcroft*, 376 F.3d 898, 902 (9th Cir. 2004). We review the

IJ's determination of purely legal questions *de novo. Kanka-malage v. INS*, 335 F.3d 858, 861 (9th Cir. 2003).

[1] The only two circuits that have compared the effects of an administrative voluntary departure and a turnaround at the border on the continuity of an alien's physical presence have concluded that the two means of departure are substantively and procedurally distinguishable and that only the former interrupts the continuity of an alien's physical presence. *See Reyes-Vasquez v. Ashcroft*, 395 F.3d 903, 907 (8th Cir. 2005) (holding that an alien who had been present in the United States since 1984 and returned to Mexico for two weeks in 1990 to attend to his ailing grandfather did not break the continuity of his presence by simply being turned around at the border upon his attempted reentry); *Morales-Morales v. Ashcroft*, 384 F.3d 418, 427 (7th Cir. 2004) (holding that an alien who had been present in the United States since 1986 and went to Mexico for approximately two weeks in 1999 to care for her gravely ill mother did not break her continuous physical presence when she was turned around at the border upon attempting to reenter the United States). In a decision announced after it affirmed without opinion the IJ's decision in this case, the BIA has likewise concluded that a turnaround at the border by itself does not interrupt an alien's physical presence. *In re Avilez-Nava*, 23 I. & N. Dec. 799, 807 (BIA 2005) (en banc). In reaching its conclusion in that case the BIA cited with approval and stated that it was guided by the Seventh and Eighth Circuit decisions noted above, *Morales-Morales* and *Reyes-Vasquez. Id.* at 804-05.

[2] Upon review of the relevant statutory provisions, we agree that being turned away by immigration officials at the border while attempting to reenter this county does not itself have the effect of terminating an alien's accrual of physical presence in the United States in the same way that removal or administrative voluntary departure does.

Congress initially established the physical presence requirement through a 1948 amendment to the Alien Act of 1940.[3] Endorsing the amendment, the Senate Judiciary Committee explained that it was necessary in order to provide an opportunity for relief for individuals who had lived in the United States for many years, but were deportable on technical grounds.[4] In passing the original amendment Congress explicitly recognized that individuals who had resided in the United States for a substantial period of time were likely to have established deep roots in the country, which in certain situations justified an individualized determination by the Attorney General as to whether deportation would be unduly harsh. *See S. Rep. No. 80-1204*, 1948 U.S.C.C.A.N. 2234, 2236 (reasoning that as the committee already reviewed selected cases of deportable aliens who had resided in the United States for many years and, where appropriate, recommended the enactment of private bills to adjust their immigration status, it was "only just that other persons in this category who have not been favored by the introduction of private bills should have their cases considered for relief").

Consistent with its intent to provide an opportunity for relief to aliens who have been long-term residents of this country, Congress subsequently made clear that the physical presence requirement should be applied with a degree of flexibility, such that an individual who otherwise meets the requirement "does not destroy his eligibility by actions that do not affect his commitment to living in this country." *Castrejon-Garcia v. INS*, 60 F.3d 1359, 1362 (9th Cir. 1995). It did so in direct response to a decision by the Supreme Court which interpreted the requirement for "continuous" physical presence literally. Reviewing a predecessor to the current § 1229b, the Court concluded that the requirement of "contin-

---

[3]Act of July 1, 1948, Pub. L. No. 80-863, 62 Stat. 1206, *amending* the Alien Registration Act, 54 Stat. 670 (1940).

[4]S. Rep. No. 80-1204 (1948), *reprinted in* 1948 U.S.C.C.A.N. 2234, 2236.

uous" physical presence meant that an alien could not leave the country for any reason, no matter how brief, without irrevocably breaking the continuity of his physical presence. *INS v. Phinpathya*, 464 U.S. 183, 195-96 (1984).

Congress reacted by amending the statute to include an explicit exception to the continuous physical presence requirement for absences that were "brief, casual, and innocent." The Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 315(b), 100 Stat. 3359 (the "1986 amendment"). Introducing the 1986 amendment, Rep. Roybal explained that it was "the intent of Congress that the requirement [of continuous physical presence] not be literally or strictly construed in light of the recent Supreme Court opinion that did so. The practical result of the Supreme Court's opinion is to nullify the suspension of deportation provision, a result Congress could not have intended." 130 Cong. Rec. H16,348 (June 14, 1984). Elaborating, Rep. Frank explained that "[w]hat we want to say is that if you had no intention of breaking your residence, but if you left on a brief vacation or a family problem, that should not make you start from scratch from the present." *Id.* at 16,349.

**[3]** Congress revised the relevant statute again ten years later in 1996. The 1996 amendment, which governs this case and continues to be in effect, is codified at 8 U.S.C. § 1229b(d)(2), and titled "Treatment of certain breaks in presence." It provides that an alien breaks the continuity of his physical presence if he departs from the United States "for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days." Although the language providing an affirmative exception for a "brief, casual, and innocent" absence was dropped in the 1996 revision, by providing that absence for a period in excess of ninety days breaks the continuity of physical presence, the statute as amended plainly indicates that an absence of a shorter duration does not necessarily break the continuity of presence in this country. As we reasoned in *Vasquez-Lopez*, if Congress had intended

to create a bright line rule in which an absence of any length interrupts an alien's continuous physical presence, "it would have been pointless for it to mandate that absences beyond the 90/180-day period would constitute a break." 343 F.3d at 972.

**[4]** Because Congress did not explicitly specify when an alien absent for less than ninety days may continue to accrue time toward the continuous physical presence requirement and when the accrual of time is terminated, we must make that decision by interpreting the statute in a way consistent with Congress's intent. *See United States v. Buckland*, 289 F.3d 558, 565 (9th Cir. 2002) (en banc) ("Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme.") (internal quotation omitted).

In *Vasquez-Lopez* we followed the BIA's reasoning in *Romalez-Alcaide* that because an order of removal is intended to end an alien's physical presence and because an administrative voluntary departure is in lieu of removal proceedings and the entry of an order of removal, "it followed that administrative voluntary departures should likewise be seen as severing the alien's physical tie to the United States." *Vasquez-Lopez*, 343 F.3d at 972. The *Vasquez-Lopez* decision also noted that the BIA in *Romalez-Alcaide* "likened the proceedings" under the statute governing administrative voluntary departure to a " 'plea bargain,' " and then quoted the BIA's decision to explain its reasoning:

> The alien leaves with the knowledge that he does so in lieu of being placed in proceedings. The clear objective of an enforced departure is to remove an illegal alien from the United States. There is no legitimate expectation by either of the parties that an alien could illegally reenter and resume a period of continuous physical presence.

343 F.3d at 973 (quoting *Romalez-Alcaide*, 23 I. & N. Dec. at 429).

Tapia's situation is distinguishable. Unlike the alien in *Vasquez-Lopez*, Tapia did not depart pursuant to a formalized process that resulted in an agreement "under which [he] agreed to depart and not to return other than in accordance with the entry process applicable to all aliens." 343 F.3d at 974. Vasquez-Lopez could not resume his prior residence in the country without violating the agreement he signed with the government. 8 C.F.R. § 240.25(c). Tapia entered into no such agreement. That makes a critical difference. *See Reyes-Vasquez*, 395 F.3d at 907-08 (observing that those cases in which a finding of a break in continuous presence has been upheld, the threat of deportation was clearly expressed and understood by the alien and the record contained evidence that the alien was informed of and accepted the terms of his departure).

Moreover, unlike the alien in *Vasquez-Lopez*, Tapia was not statutorily prohibited from immediately reapplying for admission to the United States. Both removal and administrative voluntary departure bar the alien from seeking readmission to the United States for a period of years. *See* 8 U.S.C. § 1182(a)(9). To permit an alien who was removed or left pursuant to an administrative voluntary departure to continue to accrue physical presence would thwart Congress's clear intent that such an alien be inadmissible for years following the date of his departure. *See Romalez-Alcaide*, 23 I. & N. Dec. at 429 (explaining that when an alien departs pursuant to an administrative voluntary departure there "is no legitimate expectation by either of the parties that [he] could illegally reenter and resume a period of continuous physical presence"). Those statutory bars did not apply to Tapia, however.[5] It simply cannot be said in this case, as it was in *Romalez-Alcaide* and *Vasquez-Lopez*, that there was " 'no legitimate expectation by either of the parties that [the alien] could illegally reenter and

---

[5]Indeed, in his affidavit Tapia claimed he was explicitly told by a border officer that because he was voluntarily returning to Mexico, it would have no effect on his ability to return to the United States in the future.

resume a period of continuous physical presence.' " *Morales-Morales*, 384 F.3d at 428 (quoting *Romalez-Alcaide*, 23 I. & N. Dec. at 429).

**[5]** We conclude that, for purposes of determining eligibility for cancellation of removal, Tapia's physical presence was not interrupted by the fact that he was initially stopped and turned around at the border when he attempted to reenter the country. To hold otherwise would be contrary to Congress's intent to imbue the continuous physical presence requirement with flexibility to accommodate humanitarian objectives, such as an alien's brief trip back to his native country after the passing of a family member, which do not reflect on the alien's long-term commitment to this country or the depth of roots he has established here. An alien's roots are no less deep and ties no less interwoven simply because he was stopped at the border on his initial attempts to reenter this country after briefly departing on a trip that did not meaningfully interrupt his relationship with the United States.

**[6]** The exception for brief absences cannot be denied simply because an alien attempted to reenter the United States illegally. If attempting an unlawful reentry precluded application of the "brief absence" exception, the statute would have no meaning. Tapia, like others in his situation facing removal from this country, was not eligible to come back legally. If he could have, he presumably would not be facing removal.

**[7]** Nor would it be logical or consistent with the intent of the statute to limit eligibility to those returning aliens who were able to return without being stopped or getting caught on their first attempt. If we were to conclude that being turned around at the border in and of itself interrupted an alien's physical presence, we would arbitrarily reward those returning aliens who were particularly adept or lucky in their ability to cross the border without getting stopped. Whether a returning alien can successfully cross into the United States on his

first try has no relevance to the rationale behind the exception Congress created for brief breaks in physical presence.

We note that the BIA currently appears to agree with this analysis. Its decision in *Avilez-Nava* concerned an alien who was not successful in returning to the United States on the first try. That case, like this one, involved the ten-year physical presence requirement for cancellation of removal. The alien in that case testified that she had returned to Mexico one time, for approximately two weeks, to support her mother after her grandmother died. When she sought to return to the United States through a port of entry, she was stopped by immigration authorities, told that she could not enter because she did not have proper documents, and was then escorted to a door back across the border and returned to Mexico. She re-entered illegally two days later. Although the IJ denied her application for cancellation of removal, the BIA concluded that her case was distinguishable from *Romalez-Alcaide* and sustained her appeal of the IJ's decision.

[8] Tapia's photograph and fingerprints were taken by border officers when he was turned away, and information about the rejections was entered into the government's computer database, but that does not cause us to reach a different conclusion. Whether an alien happened to encounter a border officer who decided to make a record of the turnaround or to take a photograph or fingerprints of the alien before returning him to Mexico has no bearing on whether that alien has developed a significant relationship with the United States through an extended residency such that he should qualify for an opportunity to have the Attorney General consider his situation for possible cancellation of removal.

We recognize that in *Avilez-Nava*, 23 I. & N. Dec. at 805, the BIA identified photographs and fingerprints as two types of evidence which may indicate that an alien was subjected to "formal, documented process" sufficient to break his continuous physical presence. *Id*. at 805-06. The BIA did not hold

that the acts of photographing or fingerprinting themselves constituted sufficient formal process, however. Indeed, it could not so hold, given its approval of the Eighth Circuit's decision in *Reyes-Vasquez*, since its own description of *Reyes-Vasquez* noted that the alien involved in that case had been fingerprinted by the Border Patrol. *See* 23 I. & N. Dec. at 805.

**[9]** The making of that kind of record does not amount to a "formal, documented process pursuant to which the alien was determined to be inadmissible." *Id*. at 801. In contrast to the informality surrounding a turnaround at the border, where Congress has authorized immigration officials to make an actual determination of inadmissibility, it has identified specific procedures and authorized only certain individuals to make the determination, not any immigration or border officer. *See* 8 C.F.R. §§ 240.25 (administrative voluntary departure), 235.3 (expedited removal). Nor does the existence of a record of a turnaround demonstrate that the alien entered into an agreement not to return to the United States later. There is no reason that Tapia should be treated differently just because a record was made when he was turned away.

## IV.  CONCLUSION

**[10]** Because Tapia was turned around at the border without entering into a formal agreement with the government whereby the terms and conditions of his departure were clearly specified, and because he was not statutorily barred from immediately reapplying for admission to the United States, we grant his petition. We do not hold that Tapia has satisfied the requirement of being continuously present in the United States, but only that the fact that he was turned around at the border when he initially attempted to reenter did not interrupt the continuity of his presence. We therefore remand this matter to the BIA for further proceedings. To be statutorily eligible for cancellation of removal, Tapia must establish that he meets the ten-year physical presence requirement,

as well as the other requirements set out in the statute. On remand both parties are entitled to present additional evidence regarding any of the predicate eligibility requirements, including continuous physical presence.

**PETITION GRANTED; REMANDED.**