**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE VALADEZ-MUNOZ,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

*Respondent.*

No. 06-72510

D.C. No.
A075-219-367
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 5, 2010—San Francisco, California

Filed October 28, 2010

Before: Ferdinand F. Fernandez and Barry G. Silverman,
Circuit Judges, and Kevin Thomas Duffy,* District Judge.

Opinion by Judge Fernandez

---

*The Honorable Kevin Thomas Duffy, United States District Judge for
the Southern District of New York, sitting by designation.

17923

---

**COUNSEL**

Orit Levit, Korenberg & Abramowitz, Sherman Oaks, California; John M. Levant, ASK Law Group, Los Angeles, California, for the petitioner.

Liza Murcia, United States Department of Justice, Civil Division, Washington, D.C., for the respondent.

---

**OPINION**

FERNANDEZ, Circuit Judge:

Jose Valadez-Munoz, a native and citizen of Mexico, petitions for review of the Board of Immigration Appeals' (BIA) dismissal of his appeal from the Immigration Judge's (IJ) order of removal. Specifically, he asserts that the BIA erred when it determined that he was removable because he had made a false claim of United States citizenship,[1] and because

---

[1]*See* 8 U.S.C. § 1182(a)(6)(A)(i), (a)(6)(C)(ii).

he was not entitled to cancellation of removal due to a break in his continuous physical presence in the United States.[2] We deny the petition.

## BACKGROUND

Valadez first entered the United States without inspection in December of 1987 at the age of sixteen, and resided in the United States thereafter, although he visited his family in Mexico for about four months in 1988, three weeks in 1992, and a month in 1994. In 1994, his brother gave him a State of Texas birth certificate for Robert Louis Moreno. Valadez used that birth certificate to obtain a California driver license in the name of Robert Moreno so that he could more easily obtain and maintain employment.

In January of 1997, Valadez again left the country for Mexico; he traveled by airplane to Mexico so that his then fiancée could meet his family. Following his return flight to the Houston, Texas airport on February 15, 1997, he attempted to use the false Texas birth certificate and the driver license to reenter the United States under the name of Robert Moreno. He was asked a few questions by the primary immigration inspector, who, unsatisfied with the responses, sent him to a secondary inspection officer for intensified inspection.

The secondary inspector asked Valadez questions about his family based on the birth certificate. After Valadez gave contradictory answers, the inspector left to gather more information about Robert Moreno. When the inspector returned, Valadez continued to assert that he was Robert Moreno. It was not until the secondary inspector confronted Valadez with biographical information about the real Robert Moreno (height, weight, presence of tattoos), which was inconsistent with Valadez's appearance, that he confessed his true identity. The officer found that he was an excludable alien and gave

[2]*See* 8 U.S.C. § 1229b(b)(1)(A).

him the option of either seeing an IJ or withdrawing his application for admission and voluntarily returning to Mexico. Valadez chose the latter option and signed a document which stated, among other things, "[a]lthough I understand I may choose to appear before an immigration judge for a hearing in exclusion proceedings, I request that I be permitted to withdraw my application for admission and return abroad." That request was granted, and he returned to Mexico that same day, but a few days later he reentered the United States without inspection.

Valadez married his current wife, a United States citizen, on July 27, 1998. The couple's first child, a United States citizen, was born on September 29, 1999. Their second child, also a United States citizen, was born on February 26, 2004. Valadez applied for adjustment of status in December of 2001, but his application was denied on November 19, 2002, on the basis that he was ineligible due to his false claim of United States citizenship. *See* 8 U.S.C. § 1255(a).

On February 4, 2003, removal proceedings were initiated against Valadez. The notice to appear charged that he was subject to removal under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without being admitted, and under § 1182(a)(6)(C)(ii) as an alien who has falsely represented himself to be a United States citizen. Following a hearing on August 23, 2004, in which Valadez testified regarding the alleged 1997 false claim to citizenship incident, the IJ found that he was removable under § 1182(a)(6)(C)(ii). The IJ found that Valadez had made a false claim of citizenship in 1997 when attempting to gain entry, and that he did not timely retract that false claim.

In November of 2004, Valadez submitted an application for cancellation of removal based upon hardship to his wife and children. At the hearing on February 11, 2005, the Department of Homeland Security argued that Valadez was ineligible for cancellation of removal because his withdrawal of his

application for admission at the Houston Airport and subsequent immediate voluntary return to Mexico interrupted his continuous physical presence in the United States, as a result of which he had not been here for ten years "immediately preceding the date of" his application for cancellation of removal. *See* 8 U.S.C. § 1229b(b)(1)(A). Following the hearing, the IJ determined that "the February 1997 rejection of his application for admission, followed by his immediate departure from the United States while under custodial control, disrupted the continuity of [his] required 10 years of domicile in the United States." As a result, the IJ denied the application for cancellation of removal.

The BIA dismissed Valadez's appeal. In so doing, it independently reviewed the IJ's findings and agreed that Valadez was not entitled to adjustment of status. *See* 8 U.S.C. § 1255(a). It held that Valadez's presentation of a Texas birth certificate to immigration officers constituted a false claim of United States citizenship. It also held that Valadez did not timely retract his claim of citizenship because he failed to correct his misrepresentation prior to its exposure as a falsity. It finally held that his withdrawal of his application for admission and return to Mexico broke his physical presence in the United States. That precluded him from obtaining cancellation of removal relief. Valadez timely petitioned this court for review.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction to entertain Valadez's petition for review. *See* 8 U.S.C. § 1252.

"When, as here, the BIA conducts an independent review of the IJ's findings, this court reviews the BIA's decision and not that of the IJ." *Poblete Mendoza v. Holder*, 606 F.3d 1137, 1140 (9th Cir. 2010). We review findings of fact for substantial evidence. *See Blanco v. Mukasey*, 518 F.3d 714, 718 (9th Cir. 2008); *see also INS v. Elias-Zacarias*, 502 U.S.

478, 481 & n.1, 483-84, 112 S. Ct. 812, 815 & n.1, 817, 117
L. Ed. 2d 38 (1992). We apply "the principles of deference
described in *Chevron U.S.A., Inc. v. Natural Resources
Defense Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81
L. Ed. 2d 694 (1984)" when we confront "questions implicat-
ing '[the BIA's] construction of the statute which it adminis-
ters.' " *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424, 119 S. Ct.
1439, 1445, 143 L. Ed. 2d 590 (1999).

## DISCUSSION

Valadez complains of the BIA's determination that he was
not eligible for adjustment of status, and that he was not eligi-
ble for cancellation of removal. We will consider each of
those complaints in turn.

### A.  *Adjustment of Status; False Claim of Citizenship*

The parties do not dispute that Valadez cannot obtain
adjustment of status if he is inadmissible. *See* 8 U.S.C.
§ 1255(a). As we will explain, because of his actions at the
border on February 15, 1997, when he applied to reenter, he
is inadmissible.

There can be no doubt that an alien "who falsely represents,
or has falsely represented, himself or herself to be a citizen of
the United States for any purpose or benefit under this chapter
. . . or any other Federal or State law is inadmissible." 8
U.S.C. § 1182(a)(6)(C)(ii)(I). Moreover, an alien has the
"burden of establishing . . . clearly and beyond doubt" that he
is "entitled to be admitted and is not inadmissible under sec-
tion 1182." 8 U.S.C. § 1229a(c)(2)(A); *see also Pichardo v.
INS*, 216 F.3d 1198, 1200 (9th Cir. 2000) (same). Beyond
that, "a decision that an alien is not eligible for admission to
the United States is conclusive unless manifestly contrary to
law." 8 U.S.C. § 1252(b)(4)(C); *Pichardo*, 216 F.3d at 1200
(same).

(1)   *The Citizenship Claim*

**[1]**  There is no dispute that when Valadez tried to enter the country with his fiancé, he knew that he was not legally entitled to do so, but presented Robert Moreno's birth certificate so that he could enter without difficulty. Of course, he had previously assumed Moreno's identity in order to obtain a driver license and, thus, obtain work in the United States. He saw use of the birth certificate as a means of obtaining entry into the United States when he had no other means available. The evidence of his claim of citizenship is not quite as strong as it would have been if Valadez had actually signed a statement admitting that he had falsely claimed citizenship,[3] or pled guilty to the crime of so doing.[4] Nevertheless, it cannot be said that the BIA's determination that Valadez intended to and did make a false claim of United States citizenship at that time was so unfounded that no "reasonable factfinder" could so determine. *Elias-Zacarias*, 502 U.S. at 481, 112 S. Ct. at 815. Indeed, in this civil proceeding we are almost asked to take a flight of fancy when we are asked to believe that Valadez was not asserting citizenship at that time.[5] We are not that gormless about life in the real world. That would seem to be an end to Valadez's claim, but, he correctly asserts, we have taken a somewhat different approach in a series of cases dealing with prosecutions[6] for violating a criminal statute.[7]

---

[3]*See Blanco*, 518 F.3d at 720-21.

[4]*See Pichardo*, 216 F.3d at 1201.

[5]This seemed so obvious to the BIA that it somewhat overstated the matter by saying that "individuals who are born within the United States are automatically considered United States citizens." Certainly the vast majority are, but there are also a few exceptions.

[6]*See United States v. Karaouni*, 379 F.3d 1139 (9th Cir. 2004); *United States v. Garcia*, 739 F.2d 440 (9th Cir. 1984); *Smiley v. United States*, 181 F.2d 505 (9th Cir. 1950).

[7]*See* 18 U.S.C. § 911 (it is a crime for a person to "falsely and willfully represent[ ] himself to be a citizen of the United States"). It should be noted that the criminal statute requires the representation to be both false and willful, while the statute we are dealing with only requires falsity.

The cases upon which Valadez relies are largely distinguishable on their facts. In *Karaouni*, 379 F.3d at 1141, 1143, for example, the actual defect was that Karaouni only stated that he was a " 'citizen or national of the United States,' " and, therefore, did not state that he was a citizen. And in *Smiley*, 181 F.2d at 506, the defendant once stated that he was a "citizen," but did not say of which country. We found that to be insufficient. Another time, Smiley told a police officer that he was born in New York, but in circumstances where citizenship may well have been the farthest thing from his mind. *Id.* That, too, was insufficient. On the other hand, *Garcia*, 739 F.2d at 443, applied *Smiley* in quite different circumstances — a statement in this country to a border patrol agent. That case would have more force in our consideration of this case were *Garcia* not a criminal prosecution. That, however, leads to the most salient and determinative distinguishing mark.

[2] The strongest riposte to Valadez's thrust is the very fact that the cases cited were criminal prosecutions where the defendant had to be found guilty beyond a reasonable doubt and we, therefore, were very concerned about the quality of the evidence.[8] Here, on the other hand, the burden of persuasion is reversed for, again, the alien has the burden of proving that he is not inadmissible "clearly and beyond doubt." 8 U.S.C. § 1229a(c)(2)(A). That makes all the difference in the world. Valadez was required to clearly show that he was not inadmissible, and he did not offset the strong inference that his activities at the border constituted a claim of United States citizenship.

[3] In fine, the BIA did not improperly determine that

---

[8]Even so, when an alien has actually asserted to a government immigration agent that he was born in this country, one would think that an inference of a citizenship claim would be permissible, depending upon the other facts in the case. *See United States v. Nevils*, 598 F.3d 1158, 1163-65 (9th Cir. 2010) (en banc) (clarifying the burden faced by the prosecution in a criminal case).

Valadez had "falsely represented himself . . . to be a citizen of the United States." *Id.* § 1182(a)(6)(C)(ii)(I).

### (2)   *Recantation*

Valadez next asserts that if he did initially make a false claim, he retracted it and, therefore, should not have been found inadmissible. We disagree.

**[4]** The doctrine of timely recantation is of long standing and ameliorates what would otherwise be an unduly harsh result for some individuals, who, despite a momentary lapse, simply have humanity's usual failings, but are being truthful for all practical purposes. *See Llanos-Senarillos v. United States*, 177 F.2d 164, 165-66 (9th Cir. 1949). The BIA has recognized the virtue of applying that principle when an alien "voluntarily and prior to any exposure of the attempted fraud corrected his testimony that he was an alien lawfully residing in the United States." *Matter of M—* , 9 I. & N. Dec. 118, 119 (BIA 1960); *see also Matter of R— R—* , 3 I. & N. Dec. 823, 827 (BIA 1949).

**[5]** Valadez's attempt to wrap himself in that cloak of goodness fails because he overlooks the important limitation on the principle. As we have pointed out, when a person supposedly recants only when confronted with evidence of his prevarication, the amelioration is not available. *See Llanos-Senarillos*, 177 F.2d at 165-66. Not surprisingly, the BIA has taken the same position for immigration cases; it has pointed out, "recantation must be voluntary and without delay." *Matter of Namio*, 14 I. & N. Dec. 412, 414 (BIA 1973). And, when the so-called retraction "was not made until it appeared that the disclosure of the falsity of the statements was imminent [, it] is evident that the recantation was neither voluntary nor timely." *Id.*

**[6]** Here Valadez did not recant until he knew that his false representations would not succeed in getting him admitted

into the country.[9] It is pellucid that the BIA did not err when it determined that Valadez could not take advantage of the timely recantation doctrine.

## B. *Cancellation of Removal*

Valadez asserts that because he made his illegal entry into the United States in December 1987, and has left for short periods only, he was "present in the United States for a continuous period of not less than 10 years immediately preceding" his application for cancellation of removal relief. 8 U.S.C. § 1229b(b)(1)(A); *see also Gutierrez v. Mukasey*, 521 F.3d 1114, 1116-17 (9th Cir. 2008) (same). Of course, the period was interrupted when he was placed in removal proceedings in February of 1993. *See Juarez-Ramos v. Gonzales*, 485 F.3d 509, 510 (9th Cir. 2007). He is correct that not every brief departure will interrupt the period of continuous physical presence. *See* 8 U.S.C. § 1229b(d)(2); *Landin-Zavala v. Gonzales*, 488 F.3d 1150, 1152 (9th Cir. 2007). However, some absences will interrupt the alien's physical presence, even if those absences are brief. *See Tapia v. Gonzales*, 430 F.3d 997, 998 (9th Cir. 2005).

The BIA has held that when an alien applies for entrance to this country and that is denied at the point of entry, the rule is:

> [A]n immigration official's refusal to admit an alien

---

[9]The following exchange occurred when the IJ was questioning Valadez:

> Q. All right, so you had made an effort to try to be convincing that you were Robert Moreno. You had two different people that questioned you and it was only after they had persuaded you that they could prove you were not Robert Moreno that you finally said all right I confess. I'm Jose Valadez-Munoz, is that what happened?
>
> A. Correct.

at a land border port of entry will not constitute a
break in the alien's continuous physical presence,
unless there is evidence that the alien was formally
excluded or made subject to an order of expedited
removal, was offered and accepted the opportunity to
withdraw his or her application for admission, or
was subjected to any other formal, documented pro-
cess pursuant to which the alien was determined to
be inadmissible to the United States.

*In re Avilez-Nava*, 23 I. & N. Dec. 799, 805-06 (BIA 2005)
(en banc). Valadez was turned away at a border port of entry,
but he argues that the cases provide for considerably broader
protection than that set forth by the BIA. He essentially
asserts that continuous physical presence may be broken if an
alien is caught within the country and voluntarily departs in
lieu of proceedings pursuant to a formal agreement, but it is
not broken if, as in this case, he is stopped at the border and
ultimately turned away. However, his formulation is far too
simplistic because the mere occurrence of a border stop is
insufficient to answer the continuous physical presence issue.
As explained in further detail below, what the BIA and this
court have actually held is that a knowing and voluntary
departure in lieu of more formal proceedings will interrupt
continuous physical presence.

**[7]** On the one hand, the BIA has declared that when "[t]he
alien leaves with the knowledge that he does so in lieu of
being placed in proceedings," he can have "no legitimate
expectation" that he "could illegally reenter and resume a
period of continuous physical presence." *In re Romalez-
Alcaide*, 23 I. & N. Dec. 423, 429 (BIA 2002) (en banc). We
have declared that to be a reasonable approach, and have
agreed that physical presence is broken when an alien is found
within the country, requests administrative voluntary depar-
ture, and is escorted to the border. *See Vasquez-Lopez v. Ash-
croft*, 343 F.3d 961, 969, 973-74 (9th Cir. 2003) (per curiam);
*see also Gutierrez*, 521 F.3d at 1118 (holding that where alien

was caught within the country and voluntary left in lieu of facing removal proceedings, the period of physical presence was broken). As the Third Circuit Court of Appeals has held, the mere fact that the departure occurred when a person was stopped at the border while attempting reentry does not change the alchemy. *Mendez-Reyes v. Attorney Gen. of the U.S.*, 428 F.3d 187, 193 (3d Cir. 2005) (holding that when an alien withdrew his application for admission in lieu of formal determination of admissibility and departed, and signed a document to that effect, his period of physical presence terminated). Of course, as we have noted above, the BIA has taken the same position. *See Avilez-Nava*, 23 I. & N. Dec. at 805-06.

**[8]** On the other hand, all agree that continuous physical presence is not interrupted if a person is merely stopped at the border and turned away without any more formality. Thus, in *Avilez-Nava*, 23 I. & N. Dec. at 800, an alien presented herself at the border without entry documents, "was taken to a room where a man explained that she could not enter" and was then "escorted to a door 'back across the border' " without further ado. That, said the BIA, did not interrupt her continuous physical presence. *Id.* at 807. We have also concluded that where a person is merely "stopped, turned around, and sent back to Mexico," that will not suffice to break his continuous physical presence. *Tapia*, 430 F.3d at 999, 1004. We also added that merely fingerprinting or photographing the alien would not constitute sufficient formality to break his continuous physical presence. *Id.* at 1003; *see also Juarez-Ramos*, 485 F.3d at 510-11 (same). The BIA agrees that some formality is required. *See Avilez-Nava*, 23 I. & N. Dec. at 807. We have further, and logically, held that continuous physical presence would not be interrupted, despite a formal agreement to depart voluntarily, where misrepresentations might have been made to the alien and he, at the very least, might not have known what he was signing. *See Ibarra-Flores v. Gonzales*, 439 F.3d 614, 619 (9th Cir. 2006). In that instance, it could not be said that he did "knowingly and voluntarily accept administrative

voluntary departure." *Id.* at 620. In other words, nothing was legally added to a simple turn around. Nevertheless, it is important to note that we did not declare that the use of procedures at the border where a person departs in lieu of more extended proceedings were not sufficient to break his period of physical presence.

Therefore, it cannot be said that the BIA's decision in *Avilez-Nava* set forth a construction of the law of continuous physical presence that can be dubbed an impermissible construction of a statute which it administers. *See Aguirre-Aguirre*, 526 U.S. at 424-25, 119 S. Ct. at 1445-46. The only question that remains is whether the facts of this case demonstrate that the BIA erred here. They do not.

**[9]** The procedure used in this case may not have been as formal as an actual completed proceeding that results in an exclusion order[10] or in an expedited removal order,[11] but it was formal nonetheless. There can be no doubt that Valadez could have been placed in removal proceedings, as he was told, and that he avoided that by requesting the withdrawal of his application for admission, a request which did not have to be granted. *See* 8 U.S.C. § 1225(a)(4); 8 C.F.R. §§ 235.4, 1235.4.

That Valadez was given the option and exercised it in writing cannot be doubted. He signed a document in which he expressly agreed that he understood that he could "choose to appear before an Immigration Judge for a hearing in exclusion proceedings," but requested that he "be permitted to withdraw [his] application for admission and return abroad." He was permitted to do just that. Moreover, he presented no evidence that he was confused about his choices or did not understand them. On the contrary, he testified that the officer gave him "an option if [he] wanted to see a Judge or if [he] wanted to

---

[10]*See Landin-Zavala*, 488 F.3d at 1153.

[11]*See Juarez-Ramos*, 485 F.3d at 511.

departure [sic] voluntarily to Mexico." Valadez then testified that he said "[O]kay, can I just go back to Mexico?"

**[10]** That is, substantial evidence supported the determination that Valadez "was offered and accepted the opportunity to withdraw his . . . application for admission" and departed voluntarily. *Avilez-Nava*, 23 I. & N. Dec. at 805. His continuous physical presence was interrupted.

## CONCLUSION

After presiding over all of the proceedings involved here, the IJ felt certain that Valadez is a good man, but that he had fallen from grace on the day in question and was not entitled to relief. We cannot disagree with any of those assessments. While it may seem somewhat rhadamanthine, because on February 15, 1997, Valadez did make a false claim of United States citizenship, he is inadmissible[12] and cannot obtain adjustment of status;[13] and because his continuous physical presence was broken on that same date, he is not eligible for cancellation of removal either.[14]

Petition DENIED.

---

[12]8 U.S.C. § 1182(a)(6)(C)(ii).

[13]8 U.S.C. § 1255(a).

[14]8 U.S.C. § 1229b(b)(1)(A).