**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE ANGEL GOMEZ ZARATE,
                    *Petitioner,*

            v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 08-70696

Agency No.
A076-349-255

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 16, 2011—San Francisco, California

Filed February 9, 2012

Before: Sidney R. Thomas, Ronald M. Gould, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Gould

1417

## COUNSEL

Noam Mendelson and Dana Mendelson, Mendelson & Associates, Daly City, California, for the petitioner.

Channah M. Farber, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

## OPINION

GOULD, Circuit Judge:

Jose Angel Gomez Zarate ("Gomez") petitions for review of an order of the Board of Immigration Appeals ("BIA") dismissing his appeal from the Immigration Judge's ("IJ") decision pretermitting his application for cancellation of removal. Gomez contends that his 1993 departure to Mexico—which occurred after he attempted to reenter the United States but was stopped by border patrol agents, arrested, charged and convicted of possessing a false identification document, and taken to the Mexican border in Immigration and Naturalization Service ("INS")[1] custody—did not interrupt his continuous physical presence for purposes of cancellation of removal. We have jurisdiction pursuant to 8 U.S.C. § 1252. We deny the petition.

## I

Gomez is a native and citizen of Mexico. He first entered the United States in January of 1989. In February of 1993, he went to Mexico for two or three weeks. Gomez attempted to reenter the United States, and at the border, gave the immigration officer a "Notification of Birth Registration" from the State of New Mexico. According to the Record of Deportable Alien (Form I-213) documenting his attempted reentry, Gomez at first claimed that he was a U.S. citizen, but on further questioning, admitted that he was a Mexican citizen and

---

[1]Pursuant to the Homeland Security Act of 2002, the functions of the former INS were transferred to the newly formed Department of Homeland Security. Pub. L. No. 107-296, 116 Stat. 2135 (2002).

that he had no documents allowing him to enter or legally remain in the United States.

Gomez was then arrested and charged in the U.S. District Court for the District of Arizona with two offenses: (1) falsely claiming U.S. citizenship, and (2) possessing a false identification document. Gomez pleaded guilty to Count 2, possession of a false identification document, in violation of 18 U.S.C. § 1028(a)(4), (b)(3).[2] Count 1 was dismissed. The district court sentenced Gomez to two years of supervised probation, but stated, "Since it is expected that the Immigration authorities will cause the defendant to leave the United States of America, no reports shall be required of defendant." After pleading guilty, Gomez went to jail for five days. He was then returned to INS custody, put into a transport filled with other aliens, taken to the Mexican border, and released. The next day, Gomez crossed into the United States on foot.

On August 17, 2000, the INS filed a Notice to Appear ("NTA") charging Gomez with removability under 8 U.S.C. § 1227(a)(1)(C)(i). At a hearing before the IJ, Gomez conceded removability, applied for cancellation of removal,[3] and

---

[2]At the time, § 1028(a)(4) punished "knowingly possess[ing] an identification document (other than one issued lawfully for the use of the possessor) or a false identification document, with the intent such document be used to defraud the United States," and § 1028(b)(3) provided for "a fine of not more than $5,000 or imprisonment for not more than one year, or both, in any other [non-enumerated] case." 18 U.S.C. § 1028(a)(4), (b)(3) (1988).

[3]The Attorney General may cancel removal of an alien who is inadmissible or deportable from the United States if the alien: "(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of good moral character during such period; (C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) . . . ; and (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1).

requested voluntary departure in the alternative. The IJ pretermitted Gomez's application for cancellation of removal, finding that Gomez's 1993 departure to Mexico interrupted his continuous physical presence and made him ineligible for cancellation of removal. The IJ granted Gomez voluntary departure. Gomez appealed to the BIA.

On October 21, 2005, the BIA remanded the matter to the IJ. The BIA found that the evidentiary record was insufficiently developed for it to conclude that Gomez's 1993 return to Mexico meaningfully interrupted his continuous physical presence. Citing *Vasquez-Lopez v. Ashcroft*, 343 F.3d 961 (9th Cir. 2003), and *In re Romalez-Alcaide*, 23 I. & N. Dec. 423 (BIA 2002) (en banc), the BIA instructed the parties to present evidence on remand on whether Gomez departed under threat of proceedings so as to terminate his continuous physical presence.

At a hearing after the remand, Gomez testified about his 1993 departure. He testified that he did not recall discussing leaving the United States before the district court. He also testified that no immigration official explained to him that he could go to immigration court and fight his case and that he was not given the option of returning voluntarily to Mexico. Gomez believed that he had no choice but to board the bus and go back to Mexico.

The IJ again pretermitted Gomez's application for cancellation of removal because Gomez did not establish the requisite continuous physical presence. The IJ found that Gomez's 1993 departure was "clearly different from" a mere turnaround at the border, thus distinguishing this case from *In re Avilez-Nava*, 23 I. & N. Dec. 799 (BIA 2005) (en banc). The IJ again granted Gomez voluntary departure. Gomez again appealed to the BIA.

The BIA dismissed Gomez's appeal. Citing *Juarez-Ramos v. Gonzales*, 485 F.3d 509 (9th Cir. 2007), and *Avilez-Nava*,

the BIA found Gomez's departure more akin to expedited removal than to a mere turnaround at the border. The BIA stated that it agreed with the IJ that "the process of being arrested by Border Patrol while attempting to enter the United States, detained, convicted of a crime related to the attempted entry, and returned to Mexico in DHS custody is sufficiently formal to constitute a break in the respondent's otherwise continuous physical presence." The BIA reinstated the IJ's grant of voluntary departure. Gomez filed a timely petition for review in this court.

## II

We review for substantial evidence the BIA's decision that an alien did not establish ten years of continuous physical presence in the United States. *Gutierrez v. Mukasey*, 521 F.3d 1114, 1116 (9th Cir. 2008). Under the substantial evidence standard, a petitioner can obtain reversal only if the evidence compels a contrary conclusion. *Id.*

## III

**[1]** To be eligible for cancellation of removal, an applicant must "ha[ve] been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application." 8 U.S.C. § 1229b(b)(1)(A). Service with an NTA ends an alien's accrual of continuous physical presence. *Id.* § 1229b(d)(1). Because Gomez was served with an NTA in August of 2000, he is eligible for cancellation of removal only if he can establish continuous physical presence in the United States since August of 1990.

**[2]** Deportation under a formal exclusion or deportation order or an expedited removal order breaks an applicant's continuous physical presence. *Landin-Zavala v. Gonzales*, 488 F.3d 1150, 1153 (9th Cir. 2007); *Juarez-Ramos*, 485 F.3d at 511 (holding that "a slightly more formal procedure at the

border—an expedited removal—does interrupt continuous physical presence"). A departure under threat of removal proceedings also interrupts continuous physical presence. *Vasquez-Lopez v. Ashcroft*, 343 F.3d 961, 973 (9th Cir. 2003) (per curiam); *Romalez*, 23 I. & N. Dec. at 424; 8 C.F.R. § 240.64(b)(3).

**[3]** On the other hand, under our precedent, "continuous physical presence is not interrupted if a person is merely stopped at the border and turned away without any more formality." *Valadez-Munoz v. Holder*, 623 F.3d 1304, 1311 (9th Cir. 2010); *see also Tapia v. Gonzales*, 430 F.3d 997, 998 (9th Cir. 2005). The BIA has stated the rule regarding turnarounds at the border as follows:

> [A]n immigration official's refusal to admit an alien at a land border port of entry will not constitute a break in the alien's continuous physical presence, unless there is evidence that the alien was formally excluded or made subject to an order of expedited removal, was offered and accepted the opportunity to withdraw his or her application for admission, or was subjected to any other formal, documented process pursuant to which the alien was determined to be inadmissible to the United States.

*Avilez-Nava*, 23 I. & N. Dec. at 805-06.

**[4]** Gomez contends that the proceedings after his 1993 departure to Mexico were not the sort of "formal, documented process" that breaks continuous physical presence. We disagree.

**[5]** The evidence required to show a "formal, documented process pursuant to which the alien was determined to be inadmissible to the United States" sufficient to terminate an alien's continuous physical presence will vary from case to case. In *Avilez-Nava*, the BIA stated that such evidence might

include, among other things, "testimony or documentary evidence of a legally enforced refusal of admission and return such as a Record of Deportable/Inadmissible Alien (Form I-213)." *Id.* at 806. We have held that the making of a record of a turnaround, or the acts of photographing and fingerprinting, do not alone "constitute sufficient formality to break [an alien's] continuous physical presence." *Valadez-Munoz*, 623 F.3d at 1311; *Tapia*, 430 F.3d at 1003-04; *see also Juarez-Ramos*, 485 F.3d at 510-11. Something must be "legally added to a simple [turnaround]," and as we have stressed, "some formality is required." *Valadez-Munoz*, 623 F.3d at 1311.

In *Valadez-Munoz*, we rejected the argument that an alien "stopped at the border and ultimately turned away" necessarily continues to accrue continuous physical presence. 623 F.3d at 1310-11. In that case, Valadez sought to use a false birth certificate and driver's license to reenter the United States. *Id.* at 1306. After questioning from immigration inspectors, Valadez admitted his true identity. *Id.* He was given the option of either seeing an IJ or withdrawing his application for admission and voluntarily returning to Mexico; he chose the latter. *Id.* at 1306-07. Though this procedure "may not have been as formal as an actual completed proceeding that results in an exclusion order or in an expedited removal order," we held that "it was formal nonetheless" and that Valadez's continuous physical presence was interrupted. *Id.* at 1312 (footnotes omitted).

Similarly, the Second Circuit in *Ascencio-Rodriguez v. Holder*, 595 F.3d 105, 107 (2d Cir. 2010), held that an alien's conviction for illegal entry and subsequent return to Mexico broke his continuous physical presence. There Ascencio had attempted to use fraudulent documents to reenter the United States, but gave his true name at the checkpoint, was arrested and charged with illegal entry in violation of 8 U.S.C. § 1325(a)(1), and pleaded guilty to that offense before a magistrate judge. *Id.* at 107-08. Ascencio requested a hearing

before the Immigration Court, but no hearing was conducted. *Id.* at 108. Instead, "after appearing in court and signing some documents, [Ascencio] was placed on a bus and returned to Mexico." *Id.* The Second Circuit stated that the above sequence of events was "a far cry from merely being turned back at the border" and that Ascencio's departure was "more akin to a formal removal than the informal interactions at the border that the BIA and other Courts of Appeals have found insufficient to terminate a period of continuous physical presence." *Id.* at 113, 115 n.8 (citing, *inter alia*, *Tapia*, 430 F.3d at 999, and *Avilez-Nava*, 23 I. & N. Dec. at 800). The court concluded that Ascencio's § 1325 conviction was a "formal, documented process" that was "the functional equivalent of an adjudication of inadmissibility," and accordingly, held that his conviction and return to Mexico terminated his continuous physical presence within the meaning of § 1229b(b)(1). *Id.* at 115.

**[6]** While it is not an easy question because Gomez's conviction did not declare that he was inadmissible, we conclude that Gomez was subjected to a "formal, documented process" sufficient to break his continuous physical presence in the United States. *See Avilez-Nava*, 23 I. & N. Dec. at 805-06. Gomez was convicted of possessing a false identification document while attempting to enter the United States illegally. This conviction, in the context of the process that led to Gomez's departure, was "the functional equivalent of an adjudication of inadmissibility." *See Ascencio-Rodriguez*, 595 F.3d at 115. Though this process was not as formal as one resulting in an exclusion or expedited removal order, or even an illegal entry conviction, it was "formal nonetheless." *See Valadez-Munoz*, 623 F.3d at 1312. A Form I-213 documents Gomez's attempted entry. *See Avilez-Nava*, 23 I. & N. Dec. at 806. The Form I-213 states that "[a]t [the] time of applying for admission to the United States, [Gomez] presented a 'Notification of Birth Registration' document from the state of New Mexico and claimed to be a citizen of the United States." An immigration officer read Gomez his *Miranda*

rights. Gomez was arrested and charged with federal offenses, including falsely claiming United States citizenship. He appeared in federal court, represented by a public defender, and pleaded guilty to possession of a false identification document—the same document he had tried to use to gain entry into the United States. A judgment documents Gomez's guilty plea, conviction, and sentence. He went to jail for five days. Finally, he boarded a bus and returned to the Mexican border in INS custody.

**[7]** Though the circumstances of Gomez's departure do not fit neatly within the categories of departures that we have considered in prior cases, the sequence of events culminating in Gomez's return to Mexico—his presentation of a false identification document to a border official and, at least as reported on the Form I-213, his false claim of U.S. citizenship, his subsequent arrest, his guilty plea and conviction in federal court, the five days he spent in jail, and his return to the Mexican border in INS custody—was a "far cry" from a mere turnaround at the border. *See Ascencio-Rodriguez*, 595 F.3d at 113. Like the Second Circuit in *Ascencio-Rodriguez*, we conclude that Gomez's departure was "more akin to a formal removal than the informal interactions at the border that [we] have found insufficient to terminate a period of continuous physical presence." *Id.* at 115 n.8.

Gomez argues that his case is different from *Ascencio-Rodriguez* because Ascencio was convicted of illegal entry under 8 U.S.C. § 1325(a)(1), yet Gomez was convicted of possession of a false identification document under 18 U.S.C. § 1028(a)(4)—a statute that, on its face and unlike § 1325, sheds no light on an alien's admissibility.**⁴** We agree that a

---

**⁴***See Ascencio-Rodriguez*, 595 F.3d at 113 (concluding that language of § 1325 "almost mirrors the definition of *inadmissibility* contained in 8 U.S.C. § 1182(a)(6)(A)(I)"). *Compare* 8 U.S.C. § 1325(a) (penalizing "[a]ny alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers"), *and* 8

conviction under § 1028(a)(4), without more, does not render an alien ineligible for cancellation of removal. But the fact that Gomez pleaded guilty to possession of a false identification document rather than illegal entry does not deprive the process of its "formal, documented" character. *See Avilez-Nava*, 23 I. & N. Dec. at 805. Nor does it alter the fact that the formal process resulted in Gomez's return to INS custody and then to Mexico.

As we see it, Gomez got more process than the alien in *Valadez-Munoz*, whose departure we held interrupted continuous physical presence. Valadez, though given the option of going before an immigration judge, chose not to do so.[5] 623 F.3d at 1312; *see also Gutierrez*, 521 F.3d at 1117-18. Here Gomez actually appeared before a judge, albeit not an immigration judge, and pleaded guilty to an offense directly relating to his attempted reentry. In addition, not only did Gomez present an admittedly false birth registration document to a

___

U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."), *with* 18 U.S.C. § 1028(a)(4) (penalizing any person who "knowingly possesses an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States").

[5]In *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006), we held that voluntary departure breaks continuous physical presence "only when the alien has been informed of, and has knowingly and voluntarily consented to" the terms of an agreement to depart in lieu of being placed in deportation proceedings. Gomez contends that he was never given the option of going before an immigration judge and therefore that he did not "knowingly and voluntarily consent[ ] to" departure in lieu of deportation proceedings. This may be true, but the BIA's holding was not that Gomez departed voluntarily in lieu of more formal proceedings, but that the proceedings that did occur were sufficient to terminate his continuous physical presence. For this reason, Gomez's argument that he did not depart voluntarily does not help him.

border official, but also there is "documentary evidence of a legally enforced refusal of admission and return"—a Form I-213—stating that Gomez falsely claimed U.S. citizenship. *See Avilez-Nava*, 23 I. & N. Dec. at 806.

In holding that Gomez's 1993 departure broke his continuous physical presence, the BIA did not state that Gomez had been determined inadmissible, and our review is limited to the grounds actually relied upon by the BIA. *INS v. Ventura*, 537 U.S. 12, 16-17 (2002). Nevertheless, an explicit finding of inadmissibility is not essential to our holding, because to allow Gomez to continue to accrue continuous physical presence after the particular sequence of events resulting in his departure, even absent such a finding, "would be contrary to the objectives of [our immigration] laws and the BIA's relevant decisions." *Ascencio-Rodriguez*, 595 F.3d at 114 (citing *Avilez-Nava*, 23 I. & N. Dec. at 806; *Romalez-Alcaide*, 23 I. & N. Dec. at 429).

**[8]** In light of the "formal, documented process" that resulted in Gomez's return to Mexico, as shown by the Form I-213 and the judgment of conviction viewed in context, we hold that substantial evidence supports the BIA's determination that Gomez's departure was "sufficiently formal to constitute a break in [his] otherwise continuous physical presence." *See Avilez-Nava*, 23 I. & N. Dec. at 805. Gomez was thus statutorily ineligible for cancellation of removal.

**PETITION FOR REVIEW DENIED.**